# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDWIN HOSE and ERIK IRVINE HOSE, | ) | |
| | ) | Civil Action No. 07-242 |
| Plaintiffs, | ) | |
| | ) | Judge McVerry |
| v. | ) | |
| | ) | Magistrate Judge Lenihan |
| BUCA RESTAURANTS, INC., | ) | |
| | ) | Re: Doc. No. 20 |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

I.      RECOMMENDATION

It is respectfully recommended that the Motion for Summary Judgment filed by

Defendant Buca Restaurants, Inc. at Docket No. 20 be granted in part and denied in part.

It is recommended that Defendant's Motion be granted as it relates to Plaintiffs' PHRA claims,

hostile work environment claims, and Plaintiff Erik Irvine Hose's retaliation claim.  It is also

recommended that Defendant's Motion be denied as it relates to Plaintiffs' disparate treatment

claims, and Plaintiff Edwin Hose's retaliation claim.

II.     REPORT

This case involves claims of reverse race/reverse national origin discrimination in

employment under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et

seq. ("Title VII"), and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. § 951 et

seq.

A.     <u>Facts</u>

Viewing the facts in a light most favorable to Plaintiffs, the following are relevant to the

pending motion for summary judgment and are undisputed unless otherwise stated.

Defendant operates Italian restaurants across 29 states under the fictitious name Buca di

Beppo.  In July of 2002, Defendant opened a restaurant in Robinson Township, Pennsylvania at

the Robinson Town Center.  Plaintiff Edwin Hose ("Edwin") began working for Defendant on

October 25, 2002.  Around this time, Mike Valent ("Valent") was the Kitchen Manager at the

Robinson Township restaurant.  (Sherwood Dep., Doc. No. 49 at 10-11.)  Plaintiff Erik Irvine

Hose ("Erik") began working for Defendant on June 27, 2003.  In August 2003, Valent was

named the Paisano Partner, or manager, of the Robinson Township restaurant.

Defendant contends that when the Robinson Township restaurant opened, its sales

amounted to close to $100,000 in sales per week; a year and a half later, sales declined to

$50,000 per week.  (Defendant's Statement of Undisputed Material Facts, Doc. No. 21 at ¶¶ 11-

12.)  At this time, many employees were complaining about losing hours.  Yet, Plaintiffs contend

that despite declining sales, more and more Mexicans were being hired.  (Plaintiffs' Response to

Defendant's Statement of Undisputed Material Facts, Doc. No. 28 at ¶ 13.)  Plaintiffs also

contend that even though they were scheduled for a certain number of hours, they did not work

all the hours for which they were scheduled.  Plaintiffs contend that this was due to the fact that

Defendant was replacing $11.00/hour Caucasian/Americans with Mexican replacements, who

were asked to come in and help, while Edwin was sent home early.  (Doc. No. 28 at ¶ 14.)

Edwin's schedules and corresponding Earnings Statements submitted by Defendant reflect that

Edwin often worked fewer hours than those for which he was originally scheduled. (Doc. No. 23-10 at 8-19; 21-42.) Defendant sent Erik home before the end of his scheduled shift on a few occasions (less than five times). Defendant contends that other employees were sent home before the end of their scheduled shifts when business was slow, regardless of race or national origin, and that the least experienced employees were chosen first. (Doc. No. 21 at ¶¶ 15, 21.) Plaintiffs respond that within the Kitchen Operations of the restaurant, where the majority of the employees were Mexicans, it was the Caucasians that were relieved of their full shifts as delineated on the schedule, not the Mexican workers. (Doc. No. 28 at ¶ 15.) Moreover, Plaintiffs contend that if Defendant's decision was based on who had the least experience, Edwin should have been the last to be relieved of his scheduled hours. (Doc. No. 28 at ¶ 21.)

Edwin never received any type of verbal or written warning, nor was he disciplined in any way during his employment with Defendant. In fact, Edwin was considered to be an outstanding employee. (Valent Dep., Doc. No. 23-7 at 5.) Erik had never been disciplined for any reason prior to his termination.

Many of Defendant's employees of Hispanic/Mexican descent spoke only Spanish. Erik indicated that this language barrier slowed his ability to do his work. (Doc. No. 28 at ¶ 25.) Erik also indicated that the Hispanics/Mexicans would laugh and point at him while speaking Spanish and that this occurred four (4) days a week. (Doc. No. 23-3 at 18.) When asked what other ways that the "Mexicans harassed [him], other than this making fun of [him] and [his] father," Erik responded, "[t]hat's all it was, really." (Doc. No. 23-3 at 18.) Erik never complained about alleged harassment to Valent or any other higher-level supervisor.

Edwin testified that he was "subjected to suggestions by Mr. Valent to learn to speak

Spanish or feel free to leave the company." (Doc. No. 27 at 31.) He also testified that the "Mexican dishwashers" were "jabbering" at him in Spanish and Edwin did not know whether "they're plotting to do something to me or they're just making fun of me the way I'm dressed." (Doc. No. 23-2 at 5.) He indicated that he knew that they were talking about him because they would stare at him and point. (Doc. No. 23-2 at 5.) Edwin also indicated that he believed one of his Hispanic/Mexican co-workers was responsible for stealing his lighter.

Edwin complained to Valent on Erik's behalf about Erik losing hours to Hispanic/Mexican employees in a handwritten note dated September 7, 2003; Edwin authored the note and signed Erik's name. (Doc. No. 30-4 at 4-5, Doc. No. 29-9 at 22-23.) Edwin also authored a three-page, single-spaced, typed letter dated August 4, 2003, directed to Defendant. (Doc. No. 30-4 at 6-8.) Edwin testified that Valent and other representatives of Defendant saw this letter. (Edwin Dep, Doc. No. 23-2 at 12-13.) Edwin complained about Erik performing the work of Hispanic/Mexicans dishwashers as well as Erik's own duties and the Assistant Kitchen Manager, Susan Baudas' acknowledgment of the same; the return to work at Defendant of a former employee who, allegedly, had been deported to Mexico and was now back illegally; Susan Baudas' alleged efforts "to aid possible illegals [sic] by the promise of work to any Mexican that makes it to Pittsburgh and to Buca" (Doc. No. 30-4 at 7); the number of Spanish speaking employees, many of whom he believed to be in the United States illegally; Susan Baudas' encouraging all employees to learn to speak Spanish; and indicating his willingness to testify in court "to pursue justice if there is a crime being committed here [at Defendant]." (Doc. No 30-4 at 8) Edwin concluded the letter as follows: "Susan Baudas can in no way justify her actions

today to my satisfaction.  I am angered beyond words."  (Doc. No. 30-4 at 8.)[1]

Erik's termination from Defendant

Erik started his shift on New Years Eve, 2003, in the morning.  Erik informed Greg
Mandich, Kitchen Manager ("Mandich"), that he had a family gathering at 5:00 p.m. and that he
needed to leave as soon as he completed his duties.  (Erik Hose Dep., Doc. No. 23-3 at 24.)
Mandich responded: "Okay."  (Erik Hose Dep., Doc. No. 23-3 at 24.)  One of Erik's co-workers,
Victor Muzopappa, needed to leave work early to go see his lawyer.  Mandich told Erik that he
had to stay after his shift concluded at 3:00 p.m. to complete Muzopappa's duties.  Erik claims
that he started working on Muzopappa's duties around 5:30 p.m., but that the Mexicans "started
messing with [him]."  (Doc. Nos. 21 & 28 at ¶ 44.)  At that point, Erik grabbed his coat and
walked out.  Erik did not finish Muzopappa's duties, punch out on the time clock, or inform his
supervisors that he was leaving.  Erik returned for his scheduled shift at 9:00 a.m. the next day,
was sent home, and told to return at noon to speak to Valent.  At noon, Valent informed Erik that
he was being terminated for leaving his shift without notifying management.  Defendant's Code
of Conduct provides as follows:

. . .

Attendance Standards
You are expected to monitor your schedule and arrive at work on time and in the
proper uniform.  You are expected to be ready to work on time after breaks.  If you
are sick or cannot come to work, it is your responsibility to contact your
Paisano/Manager at least four hours prior to your scheduled arrival and to try to
find someone to take your shift before you contact the Paisano/Manager.  In the
event of an emergency, you are required to call as soon as possible.  <u>If you fail to</u>

---

[1]Plaintiffs devote a considerable portion of their briefing and submissions to the Court
discussing and attempting to substantiate their claims that the Hispanics/Mexicans employed by
Defendant are illegal aliens.  This issue is irrelevant to the Motion for Summary Judgment
presently before the Court.

notify the Paisano/Manager after 24 hours of absence, we will assume that you
have resigned and your employment will be terminated.
. . .

Standards of Conduct
We strive to take a constructive approach to disciplinary matters to ensure that
actions that would interfere with our operations or a family member's satisfactory
performance of his/her job are not continued.  Violations of our standards and/or
lack of performance by the family member will result in one of the following
forms of corrective action:
**Verbal Warning, Written Warning, Probation, Suspension or Termination.**
. . .

(Doc. No. 30-6 at 2-3) (underline added) (boldface in original).[2]


Edwin's termination from Defendant

The parties' versions of the facts differ dramatically with regard to the facts and

circumstances surrounding Edwin's termination.  Defendant states that Edwin made the decision

not to return to work after his son was terminated on January 1st.  Plaintiffs contend that Edwin

did return to work on January 2, 2004, completed his duties early, and was permitted by Mandich

to leave early, and that Edwin's pay stub for the relevant pay period supports this assertion.  See

Plaintiffs' Exhibit Q, Doc. No. 31-2 at 2-4.  Edwin testified that Mandich wanted Edwin to

continue working for Defendant, and that Mandich told Edwin that he would tell Valent to call

Edwin to discuss Erik's termination.  (Edwin Dep., Doc. No. 23-2 at 28-29.)  Edwin went home to

wait for Valent's call; Valent never called Edwin.  Edwin arrived to work on January 3, 2004 for

his scheduled shift, became so enraged at the sight of Muzopappa's car in the parking lot and

Valent's failure to call him to discuss Erik's termination, that he did not go into the building to

---

[2]Defendant's employee handbook is drafted in terms of all employees being a member of
one family, and relates to Defendant's attempts to create a southern Italian family style dining
experience.  Consequently, terminology relating to "family" is used throughout the handbook.
(Doc. No 23-4 at 2-35.)

report to work.  (Doc. No. 28 at ¶¶ 51-53, Doc. No. 29-9 at 27-31.)  Plaintiffs indicate that Edwin

wanted to continue his employment with Defendant but wanted Valent to justify his firing of Erik.

(Doc. No. 28 at ¶ 52.)  According to letters written by Mandich and Valent to the Pennsylvania

Human Relations Commission, Edwin was terminated on January 3, 2004 for failing to report to

work on January 2.  <u>See</u> Doc. No. 31-3 at 1-2.  In its Reply to Plaintiffs' Statement of Additional

Facts in Opposition to Defendant's Motion for Summary Judgment, however, Defendant admits

that Edwin worked on January 2, 2004 for 2.66 hours.  (Doc. No. 43 at ¶ 63.)  When asked by the

Referee at his unemployment compensation hearing whether he quit his job, Edwin responded

"yes."  In their Response to Defendant's Statement of Undisputed Material Facts, Plaintiffs state

that at the time of the unemployment hearing, Edwin "did not know there was a difference

between quitting and waiting for Management to resolve issues."  (Doc. No. 28 at ¶ 56.)


   B.  <u>Legal Standard</u>

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the

pleadings, depositions, answers to interrogatories and admissions on file, together with the

affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  Summary judgment may be granted against

a party who fails to adduce facts sufficient to establish the existence of any element essential to

that party's case, and for which that party will bear the burden of proof at trial.  <u>Celotex Corp. v.

Catrett</u>, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying

evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden

has been met, the nonmoving party must set forth "specific facts showing that there is a <u>genuine</u>

issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e) (emphasis added by Matsushita Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986). While any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. See Fed.R.Civ.P. 56 (e); Celotex Corp., 477 U.S. at 324; J.F. Feeser,Inc., v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).

C.    Analysis

1. PHRA

Defendant argues that Plaintiffs filed the above-captioned case more than two years after they received notice of their right to sue; and consequently, Plaintiffs' claims arising under the PHRA are untimely and should be dismissed with prejudice. (Memorandum of Law in Support of Defendant's Motion for Summary Judgment, Doc. No. 22 at 2-3) [hereinafter "Doc. No. 22 at __"]. "Plaintiffs stipulate to having their PHRA complaints dismissed from the case." (Plaintiff's [sic] Brief in Opposition to Defendant's Motion for Summary Judgment, Doc. No. 27 at 5) [hereinafter "Doc. No. 27 at ___"]. Therefore, Defendant's Motion for Summary Judgment as it relates to Plaintiffs' PHRA claims should be granted.

2. Disparate Treatment

8

Plaintiffs' claims of reverse race/reverse national origin discrimination are analyzed under a modified burden shifting analysis that differs slightly from the usual test employed under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Iadimarco v. Runyon, 190 F.3d 151 (3d Cir. 1999). Initially, the Plaintiffs have the burden of establishing a prima facie case by presenting "sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the [employer] treated Plaintiffs 'less favorably than others because of [their] race, color, religion, sex, or national origin.'" Id. at 163 (quoting Furnco Const. Corp. v. Waters, 438 U.S. 567, 577 (1978)).

If the Plaintiffs successfully establish their prima facie case, then the burden of production (but not the burden of persuasion) shifts to the employer to "'articulate some legitimate, nondiscriminatory reason for the employee[s'] rejection.'" Id. at 157 (quoting McDonnell Douglas, 411 U.S. at 802). Once the employer carries its burden, then the burden shifts back to Plaintiffs to prove by a preponderance of the evidence that the legitimate reasons proffered by the employer were not the true reasons, but were merely a pretext for discrimination. Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)).

To survive a motion for summary judgment at step three of the burden shifting analysis, the Plaintiffs must present some evidence from which a reasonable jury could either: "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S. Ct. 2742, 2749 (1993); Ezold v. Wolf, Block, Schorr & Solis-

Cohen, 983 F.2d 509, 523 (3d Cir. 1992)).  The Court of Appeals for the Third Circuit further

explained the quantum of proof required at step three as follows:

> To discredit the employer's proffered reason, however, the plaintiff
> cannot simply show that the employer's decision was wrong or
> mistaken, since the factual dispute at issue is whether
> discriminatory animus motivated the employer, not whether the
> employer is wise, shrewd, prudent, or competent.  Rather, the non-
> moving plaintiff must demonstrate such weaknesses,
> implausibilities, inconsistencies, incoherencies, or contradictions in
> the employer's proffered legitimate reasons for its action that a
> reasonable factfinder could rationally find them "unworthy of
> credence," and hence infer "that the employer did not act for [the
> asserted] non-discriminatory reasons."

Fuentes v. Perskie, 32 F.3d at 765 (quoting Ezold, 983 F.2d at 531) (other internal quotations

omitted).  That is, the Plaintiffs must show, not simply that the defendant's articulated business

reason was wrong, "but that it was so plainly wrong that it cannot have been the employer's real

reason."  Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997).  The Plaintiffs

must "present evidence contradicting the core facts put forward by the employer as the legitimate

business reason for its decision."  Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005)

(emphasis added).  Evidence contradicting these core facts must be directed at the decision-

maker's belief; Plaintiffs' own beliefs and personal judgments, without more, will not raise a

genuine issue of material fact.  Simpson v. Kay Jewelers, Inc., 142 F.3d 639, 647 (3d Cir. 1998)

("Simpson's view of her performance . . . is not relevant.").  It is important to note that in light of

this standard for proving pretext at step three of the McDonnel Douglas paradigm, the United

States Supreme Court has made clear that a plaintiff is not required to present affirmative

evidence of discrimination in addition to proof of pretext.  See Reeves v. Sanderson Plumbing

Products, Inc., 530 U.S. 133, 147 (2000).  Instead, "[i]n appropriate circumstances, the trier of

fact <u>can reasonably infer</u> from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." <u>Id</u>. (emphasis added).[3]  The United States Court of Appeals for the Third Circuit recently discussed the impact of <u>Reeves</u> on the <u>Fuentes</u> standard for proving pretext as follows:

> Although <u>Reeves</u> makes clear that we may not require affirmative evidence of discrimination in addition to proof of pretext, it does not change our standard for proving pretext which "places a difficult burden on the plaintiff."

<u>Kautz</u>, 412 F.3d at 467 (quoting <u>Fuentes</u>, 32 F.3d at 765).

    1.    <u>Plaintiffs' Prima Facie case</u>

In determining whether Plaintiffs have adduced sufficient evidence of a <u>prima</u> <u>facie</u> case of reverse race/national origin discrimination, the Court must focus on whether the record evidence creates a triable issue of fact as to whether similarly situated Hispanics/Mexicans were treated more favorably than Plaintiffs.  In assessing whether certain Hispanic/Mexican employees are similarly situated, the Court is required to look at the "particular criteria or qualifications identified by the employer as the reason for the adverse action.'"[4]  <u>Pivirotto v. Innovative Sys., Inc.</u>, 191 F.3d 344, 359 (3d Cir. 1999) (quoting <u>Simpson v. Kay Jewelers</u>, 142 F.3d 639, 647 (3d Cir. 1998)).

In the context of a discriminatory discipline claim, the courts have found employees to be similarly situated only when they are involved in or accused of the same offense and are

---

[3]In <u>Reeves</u> the United States Supreme Court granted certiorari to resolve a split in the circuits as to whether a plaintiff is required to produce affirmative evidence of discrimination in addition to proof of pretext.  530 U.S. 133, 140 (2000).

[4]Neither the employee's positive performance in another category, nor his judgment as to the importance of the stated criteria, is relevant in making this determination.  <u>Simpson v. Kay Jewelers</u>, 142 F.3d 639, 647 (3d Cir. 1998) (citing <u>Healy v. New York Life Ins. Co.</u>, 860 F.2d 1209, 1216 (3d Cir. 1988)).

disciplined in different ways.  Wheeler v. Aventis Pharmaceuticals, 360 F.3d 853, 858 (8th Cir. 2004) (citation omitted). In the Third Circuit, the district courts have expounded on this test as follows:

> "In order for employees to be deemed similarly situated, it has been determined that the individuals with whom the plaintiff seeks to compare [his] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."

Ogden v. Keystone Residence, 226 F.Supp. 2d 588, 603 (M.D.Pa. 2002) (quoting Morris v. G.E. Financial Assurance Holdings, No. 00-3849, 2001 WL 1558039, at *6 (E.D.Pa. Dec. 3, 2001)); Tyler v. SEPTA, No. Civ. A. 99-4825, 2002 WL 31965896, at * 3 (E.D.Pa. Nov. 8, 2002), aff'd without op. 85 Fed. Appx. 875 (3d Cir. 2003) (to show that a particular employee is similarly situated, the employee's acts must be of comparable seriousness to plaintiff's own infraction, and engaged in the same conduct without such differentiating or mitigating circumstances). Moreover, at the prima facie prong of the analysis, "evidence of differential treatment of 'a single member of the non-protected class is insufficient to give rise to an inference of discrimination.'" Pivirotto, 191 F.3d at 359 (quoting Simpson, 142 F.3d at 646).

In support of its argument that Plaintiffs failed to establish a prima facie case of reverse race/national origin discrimination, Defendant submits that Plaintiffs have failed to present any evidence that would allow a reasonable fact finder to conclude that they were treated less favorably because of their race/national origin.  (Doc. No. 22 at 5-7.)  Defendant further submits that Plaintiffs have failed to proffer any other evidence that would give rise to an inference that Plaintiffs were terminated because of their race/national origin.  (Doc. No. 22 at 6-10.)

Here, the record evidence creates a triable issue of fact as to whether similarly situated Hispanics/Mexicans were treated more favorably than Plaintiffs. First, the deposition of Davin Sherwood supports Plaintiffs' contentions that Hispanics/Mexicans were treated more favorably than Caucasian/Americans. Sherwood worked for Defendant from October 2002 to February 2003 at the Robinson Town Center location; he was then transferred to the Station Square for approximately six months, and transferred back to the Robinson Town Center where he worked until November 2005. (Sherwood Dep., Doc. No. 49 at 9, 43) [hereinafter "Doc. No. 49 at __"]. He testified that Mike Valent spoke fluent Spanish (Doc. No. 49 at 17), and that Valent spent most of his time in the Robinson Town Center location talking with the Hispanic/Mexican kitchen personnel, and other than managers, Valent "really never talked to any of the Causasians" that worked in the kitchen. (Doc. No. 49 at 29-31, 57.)

With regard to disciplinary matters, Sherwood testified as follows:

A.                                    . . .
There were times that I know some of the Caucasians, like there was an employee Malcolm, I he [sic] think got written up for showing up late to work one time, and he got written up for it and these Spanish speaking employees would show up late all the time because they had another job, they would sometimes not show up for work for a day or two and they would never be written up. They would never be counseled. There was no disciplinary action towards them versus the Caucasians.
If Malcolm or Edwin, somebody did something like that, they would be documented 100 percent and disciplined.

Q.       Are you familiar with Buca DiBeppo's policy regarding absenteeism?

A.       The policy, yes. But what actually happened, it was not the policy. From my understanding of the policy, if you were late or absent, it was a verbal warning. The second time it happened it was written documentation. Third time, you know, written documentation, possibly suspension and possible termination.

13

Q. Was the policy applied to the Mexican workers?

A. No. Never. I guarantee you you can go through any documentation at Buca from Robinson Town Center or Station Square and I guarantee you will never find one piece of documentation on any Spanish speaking employees that were ever written up, and you will probably find quite a few on Caucasians that were written up. Like the Caucasians had a higher standard they had to follow versus the Mexicans.

Q. Would there be any particular time when the Mexicans would not come to work?

A. Oh, yes. During the, you know, so called immigration scares where a restaurant got wiped out of all the immigrants, they would just not show up to work. We would a lot of times open the kitchen at 6:00 in the morning. I'm waiting for my prep cooks to come in and my cooks to come in. Nobody would show up. And I would several times write these people up for not showing up. The documentation was ripped up, thrown away, and I was told, don't worry about it. We'll take care of it.

(Doc. No. 49 at 31-33.) Sherwood continued that if the Mexicans did not show up for work and did not call regarding the same, "they would still have a job." (Doc. No. 49 at 59.) Sherwood testified that if "a Caucasian did a no call, no show, they [sic] would be terminated." (Doc. No. 49 at 59.) Finally, Sherwood explained that if someone walked off a shift, they were always given a grace period to explain to management why their actions may have been necessary. (Doc. No. 49 at 73.)

Here, Edwin's and Erik's infractions that lead to their terminations can not be differentiated from the examples given by Sherwood regarding Hispanics/Mexicans. Instead of being permitted to return to work, Erik was terminated less than 24 hours after he left early from his extended shift. Erik's abandonment of his extended shift was accompanied by extenuating circumstances; yet, when Erik attempted to return to work for his next shift, he was terminated, and the record does not suggest that Erik's circumstances were considered by management.

14

Likewise, the record evidence suggests that Edwin was officially terminated on the same day he failed to show for his scheduled shift. <u>See</u> Doc. No. 31-3 at 1-3. Again, no effort was made to consider Edwin's concerns regarding his son's termination. Clearly, Plaintiffs have raised genuine issues of fact as to whether similarly situated Hispanics/Mexicans were treated more favorably than Plaintiffs.

2. <u>Pretext</u>

Having found that the Plaintiffs have presented enough evidence to raise a triable issue of fact regarding their <u>prima facie</u> case, the Court now turns to the second prong of the <u>McDonnel Douglas</u> paradigm. Defendant has met its burden of production by articulating legitimate business reasons for Plaintiffs' termination. According to Defendant, Erik violated its Code of Conduct when he abandoned his job before the end of shift without notifying his supervisor or punching out on the time clock. As to Plaintiff Edwin Hose, Defendant states that Edwin determined that he did not want to continue working for Defendant if the Company was unwilling to rehire Erik and Edwin admitted that he quit his job. Defendant concludes that it only terminated Edwin's employment after he failed to show up for his next scheduled shift. (Memorandum of Law in Support of Motion for Summary Judgment, Doc. No. 22 at 11.)

The Court has carefully reviewed this entire record and it is fraught with inconsistencies.

First, in its letters to the Pennsylvania Human Relations Commission, at least two representatives of the Defendant, Mandich and Valent, specifically stated that Edwin failed to show or call for his scheduled shift on January 2, 2004, that he violated the Attendance Standards and Reminders Policy, and that the decision to terminate Edwin was made on January 3, 2004.

(Doc. No. 31-3 at 1-2.)  The record evidence clearly reflects that Edwin did work on January 2,

2004, that he completed his duties, and received permission from Mandich to leave early so that

he could await a call from Valent to discuss Erik's termination.  Edwin told Mandich that he did

not want to quit.  Mandich was well aware that Edwin worked on January 2, 2004, and yet, he

stated in his letter to the Pennsylvania Human Relations Commission that Edwin failed to show or

call for his shift on that day.  Moreover,  Defendant violated its own policies in terminating

Edwin on the same day he did not show for his shift, without giving him the benefit of the 24 hour

period provided in its Code of Conduct Attendance Standards.

Next, it is undisputed that Edwin was an excellent worker.  (Valent Dep., Doc. No. 23-7 at

7, Sherwood Dep., Doc. No. 49 at 35.)  Yet, he was terminated in less than 24 hours from his

January 3, 2004 absence when Hispanics/Mexicans would be absent for days at a time.

(Sherwood Dep., Doc. No. 49 at 31.)

Likewise, Erik's termination was in violation of Defendant's Attendance Standards set out

in its Code of Conduct.  The record evidence reflects that Erik worked his shift on New Years

Eve, that he told his manager that he had plans with his family that evening, and yet was asked to

stay for an extended shift.  When Erik walked out, and returned for his scheduled shift the next

day, he was terminated.  Defendant argues that Erik's termination did not violate its Attendance

Standards because he abandoned his shift, he did not fail to show for his shift.  The court finds

Defendant's attempt to distinguish these infractions to be disingenuous, especially in light of the

fact that Defendant's own Code of Conduct does not distinguish them.

Finally, Davin Sherwood's testimony regarding disciplinary practices at Defendant also

provides evidence of pretext:

Q.      Have you ever terminated an employee or witnessed the termination of an employee for job abandonment?

A.      Yeah.  There has[sic] been people that have walked out of their shift and not returned.

Q.      Have any of those employees ever been Mexican employees?

A.      Oh, yes.  There has[sic] been Caucasian people that have walked off their shift.

Q.      Does Buca terminate them as well?

A.      Oh, yeah.  If they walk off their shift, they're terminated.  But, I mean, most of the time when somebody walked off their shift, we were not notified of it.  They didn't come up and speak to us at all.  We would just be in the kitchen really busy and go, hey, where is this person?  They walked out.  Okay.  If they didn't come in the next day, they were terminated.

        Somebody could have got a phone call that their mother died and freaked out and runs out of the building.  <u>So you always give them that grace period, okay, you know, let me know what's going on.  They come in the next day and explain themself, they're probably going to get written up</u>.  Once again, if you do something, you get a verbal, a written documentation, then possible termination.

Q.      I'm sorry, I was reading my notes can you repeat what you said?

A.      Which part?

Q.      You mentioned some sort of progressive discipline?

A.      <u>Verbal warning, written documentation, then possible termination</u>.

Q.      <u>That was for people who walked off the job?</u>

A.      <u>That was for any disciplinary action.  You know, walking off the job, that wasn't taken too lightly, but we had people that returned</u>.

(Doc. No. 49 at 71-75) (emphasis added).

Here, Edwin was considered an exemplary employee.  Both he and Erik had never been

disciplined. Yet, upon their first brush with Defendant's disciplinary procedures, they were immediately terminated. They were afforded neither verbal nor written warnings. Defendant afforded them no opportunities to explain themselves. Clearly, Defendant deviated from its own procedures outlined in its Code of Conduct, and its own customs and practices as testified to by Sherwood. Plaintiffs have presented some evidence from which a reasonable jury could disbelieve Defendant's articulated legitimate reasons for Edwin's and Erik's terminations. Consequently, summary judgment on Plaintiffs' disparate treatment claims should be denied.

### 3. Hostile Work Environment

In order to state a claim for hostile work environment based upon race and national origin, Plaintiffs must establish the following five elements: (1) they suffered intentional discrimination because of their race and national origin; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected them (subjective test); (4) the discrimination would detrimentally affect a reasonable person of the same race and national origin in their position (objective test); and (5) the existence of respondeat superior liability. See Abramson v. William Patterson College of New Jersey, 260 F.3d 265, 276-77 (3d Cir. 2001) (citations omitted); Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001) (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)). Thus, to withstand summary judgment on a hostile work environment claim, the Plaintiffs must present "sufficient evidence to give rise to an inference of discrimination by offering proof that their 'workplace [was] permeated with discriminatory intimidation, ridicule and insult, that [was] sufficiently severe or pervasive to alter the conditions of [their] employment and create an abusive working environment,' . . . and the conduct [was]

based [upon Plaintiffs' race and/or national origin]." Abramson, 260 F.3d at 278-79 (quoting

Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

In determining whether Plaintiffs have established the prima facie elements of a hostile

work environment claim, the Court is required to evaluate the entire record. See Cardenas v.

Massey, 269 F.3d 251, 260-61 (3d Cir. 2001) (citing Durham Life Ins. Co. v. Evans, 166 F.3d

139, 149 (3d Cir. 1999); Harris, 510 U.S. at 23). As noted by the United States Court of Appeals

for the Third Circuit, the court has an obligation to be "increasingly vigilant" against subtle forms

of discrimination and therefore must allow plaintiffs to prove discrimination indirectly by looking

at all of the conduct, including facially neutral behavior, in determining whether plaintiffs have

met their burden of proof. Id. at 261 (citing Durham, 166 F.3d at 148; Aman v. Cort Furniture

Rental Corp., 85 F.3d 1074, 1081-84 (3d Cir. 1996)).

Defendant argues that there is insufficient evidence in the record to support Plaintiffs'

claims for hostile work environment. First, Defendant argues that Plaintiffs' allegations of

harassment are not sufficiently severe or pervasive. Plaintiffs respond that Valent's favoring of

Hispanic/Mexicans over Caucasian Americans created a hostile work environment in the kitchen.

Specifically, Plaintiffs contend that the Hispanics/Mexicans outnumbered the

Caucasion/Americans, and at one point on New Years Eve 2003, Erik felt "uncomfortable and

unsafe." (Doc. No. 27 at 30.) Edwin also contends that he was "subjected to suggestions by Mr.

Valent to learn to speak Spanish or feel free to leave the company." (Doc. No. 27 at 31.)

The record does not reflect that Plaintiffs suffered regular and pervasive discrimination so

as to alter the conditions of their employment. When questioned in deposition as to how he

believed he was harassed, Edwin testified that Valent told him he "should speak Spanish to make

them (Hispanics/Mexicans) welcome in our country." (Doc. No. 23-2 at 4.) Edwin also indicated that he was harassed when he had a personal item stolen, specifically, a lighter from the kitchen bathroom, and when he lost hours. (Doc. No. 23-2 at 4, 75.) He also testified that the "Mexican dishwashers" were "jabbering" at him in Spanish and Edwin did not know whether "they're plotting to do something to me or they're just making fun of me the way I'm dressed." (Doc. No. 23-2 at 5.) He indicated that he knew that they were talking about him because they would stare at him and point. (Doc. No. 23-2 at 5.) Edwin also testified as follows regarding his interactions with the Hispanics/Mexicans:

> Q. What did they do to you?
>
> A. Just the constant harassment, pointing the fingers. You know what I mean?
>
> Q. I just want to understand because I thought you just said that they generally did not do that when you were in the restaurant?
>
> A. Oh. Be at all ignorant or disrespectful, is what I mean. They showed me courtesy. They showed me respect. But if I turn my back, I might be seeing finger behind me or something. You know what I'm saying? I mean, it's pretty simple.
>
> Q. But generally speaking, they were respectful of you?
>
> A. In my presence, yes.

(Doc. No. 23-2 at 21.)

Erik testified that it was difficult working with individuals who only spoke Spanish, and that it affected his ability to do his job in that it "slowed me down." (Doc. No. 23-3 at 12.) Yet, Erik also testified that he received no reprimands or criticisms from management because he was working too slowly. (Doc. No. 23-3 at 12.) Erik also testified that the Hispanics/Mexicans would laugh and point at him while speaking Spanish. He indicated that this occurred four (4) days a week. (Doc. No. 23-3 at 18.) When asked what other ways that the "Mexicans harassed [him],

other than this making fun of [him] and [his] father," Erik responded, "[t]hat's all it was, really." (Doc. No. 23-3 at 18.)

Here, the conditions described by Plaintiffs in their depositions consist of isolated incidents (theft of a lighter, feeling uncomfortable and unsafe on New Years Eve), or simple teasing (pointing and laughing while speaking Spanish). These facts do not demonstrate that the terms and conditions of their employment were detrimentally affected. See Faragher v. Boca Raton, 524 U.S. 775, 788 (1998). The United States Supreme Court in Faragher noted that the standards for judging hostility in the workplace are sufficiently demanding so as to ensure that Title VII does not become a "general civility code." Id. Thus, Plaintiffs have failed to present "sufficient evidence to give rise to an inference of discrimination by offering proof that their 'workplace [was] permeated with discriminatory intimidation, ridicule and insult, that [was] sufficiently severe or pervasive to alter the conditions of [their] employment and create an abusive working environment.'" Abramson, 260 F.3d at 278-79 (quoting Harris, 510 U.S. at 21).

Next, Defendant argues that it provided a reasonable avenue for complaint, and that Plaintiffs failed to show that Defendant had knowledge of their allegations of harassment, and failed to take prompt remedial action. Because the Court finds, as a matter of law, that Plaintiffs are unable to make out their prima facie case as to whether they suffered regular and pervasive discrimination, the Court need not address this argument.

Consequently, Defendant's motion for summary judgment on Plaintiffs' hostile work environment claims should be granted.


4. Retaliation

To withstand summary judgment on their retaliation claim, Plaintiffs must establish a prima facie case of retaliation, which consists of three elements: (1) Plaintiffs were engaged in a protected activity; (2) they were subjected to an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the employer's adverse action. See Sarullo v. U.S. Postal Service, 352 F.3d 789, 800 (3d Cir. 2003) (citation omitted); Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000) (citations omitted); Crumpton v. Potter, 305 F. Supp.2d 465, 474 (E.D. Pa. 2004) (citation omitted). If Plaintiffs establish a prima facie case of retaliation, the burden then shifts to Defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989). Once the Defendant comes forward with a legitimate, non-retaliatory reason, Plaintiffs will avoid summary judgment by showing an issue of fact exists regarding whether Defendant's proffered reason is pretextual. Sarullo, 352 F.3d at 800 (citation omitted); Crumpton, 305 F. Supp.2d at 474.

a.      Plaintiff Erik Hose

Defendant argues that Erik is unable to make our his prima facie case because he never complained to anyone in management about any alleged unlawful activity. The Court is instructed by the United States Court of Appeals for the Third Circuit regarding the first prong of the prima facie case discussed in Abramson v. William Patterson College of New Jersey, 260 F.3d 265, 287-88 (3d Cir. 2001). There, the court noted that a formal letter of complaint to an employer or to the EEOC are not the only acceptable means of engaging in a protected activity for purposes of establishing the first prong of a prima facie case for a retaliation claim. Id. (citing Barber v. CSX Distrib. Servs., 68 F.3d 694, 701-02 (3d Cir. 1995)). Instead, noted the court,

acceptable forms of protected activity include informal protests of discriminatory practices as well, including complaints to management.  Abramson, 260 F.3d at 288.  Here, other than his complaint to the EEOC and PHRC, which occurred subsequent to his termination, Erik never complained to management.  He complained only to his father and his lawyer.  (Doc. No. 23-3 at 47-48, 50-51.)  Consequently, as a matter of law, Erik is unable to make out a prima facie case of retaliation.  Defendant's Motion for Summary Judgment should be granted as it relates to Erik's claim for retaliation.

       b.     <u>Plaintiff Edwin Hose</u>

Conversely, Edwin lodged several complaints with management during his employment with Defendant.  These complaints included the September 7, 2003 handwritten note by Edwin on Erik's behalf complaining about Erik's loss of hours to Hispanics/Mexicans, and the August 4, 2003 type-written letter vehemently complaining to management about what he perceived to be illegal activity on the part of Defendant.  Defendant argues, however, that Edwin is unable to make out a prima facie case because in order for a complaint to constitute protected activity, an "employee must hold an objectively reasonable belief, in good faith, that the activity [he] oppose[s] is unlawful under Title VII.  (Doc. No. 22 at 18 (citing Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006)).  Defendant argues that no reasonable person could conclude that the August 4, 2003 letter opposed activity made unlawful by Title VII.  Defendant fails to consider all of the verbal complaints made by Edwin to management concerning what he viewed to be management's preferential treatment of Hispanics/Mexicans, including those concerning Plaintiffs' loss of hours to Hispanics/Mexicans.  See Plaintiffs' Response to Statement of Undisputed Material Facts, Doc. No. 28 at ¶ 32.

Defendant further argues that Edwin cannot establish a prima facie case of retaliation because he cannot show that he suffered an adverse employment action in that he admittedly quit his job. The record evidence discussed above regarding Edwin's separation from employment reflects that whether Edwin resigned or was terminated is a disputed issue of material fact; the court may not resolve this issue on summary judgment in that it is not permitted to weigh the evidence. Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 252-53 (3d Cir. 2007). Further, Defendant fails to acknowledge that a reduction in hours can constitute an adverse employment action. See Klimczak v. Shoe Show Companies, 420 F. Supp.2d 376 (M.D. Pa. 2005). The record reflects that, from mid August 2003 until his separation from employment, Edwin was not permitted to work all of his scheduled hours. (Doc. No. 28 at ¶ 14; Doc. No. 23-10 at 8-42.)[5]

Finally, because of the disputed issues of material fact concerning whether Edwin suffered an adverse employment action, the Court is unable to reach the issue of causation, and consequently, summary judgment on Edwin's retaliation claim should be denied.

III.    CONCLUSION

It is respectfully recommended that the Motion for Summary Judgment filed by Defendant Buca Restaurants, Inc. at Docket No. 20 be granted in part and denied in part. It is recommended that Defendant's Motion be granted as it relates to Plaintiffs' PHRA claims, hostile work environment claims, and Plaintiff Erik Irvine Hose's retaliation claim. It is also recommended

---

[5]Unfortunately, neither party has supplied the court with a comprehensive set of work schedules and corresponding pay stubs for the time periods before and after Edwin's oral and written complaints to management.

that Defendant's Motion be denied as it relates to Plaintiffs' disparate treatment claims, and Plaintiff Edwin Hose's retaliation claim.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file objections to this Report and Recommendation. Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

_____
LISA PUPO LENIHAN
United States Magistrate Judge

Dated: July 28, 2008

cc: The Honorable Terrence F. McVerry
    United States District Court Judge


    All counsel of record
    Via electronic filing